Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CRAIG FRANCIS SZEMPLE, <br><br> *Plaintiff*, <br><br> v. <br><br> UNIVERSITY OF MEDICINE & DENTISTRY OF NEW JERSEY et al, <br><br> *Defendants*. | Civil Action No. 10-00258 (JMV)(JBC) <br><br> **OPINION** |

**John Michael Vazquez, U.S.D.J.**

This case concerns allegations of medical malpractice, and related constitutional claims, made by Plaintiff, Craig Francis Szemple, an inmate at New Jersey State Prison in Trenton. Plaintiff filed suit against two groups of defendants in connection with a tooth extraction performed while Plaintiff was in state custody.[1]  The first group is the medical professionals who treated Plaintiff: University of Medicine and Dentistry of New Jersey ("UMDNJ"), University Correctional Healthcare ("UCHC"), Dr. Charles Geztoff, Sharon Aker, and Dr. Abu Ashan ("Medical Defendants").  The second group is affiliated with the New Jersey Department of Corrections ("DOC"): New Jersey DOC, George Hayman, Richard Cevasco, Thomas Farrell, Michelle Ricci, Sergeant Bundy, Senior Corrections Officer ("SCO") McCray, SCO Spiewak, SCO Albano, and unnamed John and Jane Does ("DOC Defendants").  Both groups of defendants have filed motions for summary judgment.  The Court reviewed submissions made in

---

[1] Claims against two initially named defendants, Dr. Richard Mann and Sandoz, Inc., have since been terminated.

support of the motions and considered the motions without oral argument pursuant to Fed. R.

Civ. P. 78(b) and L. Civ. R. 78.1(b).  For the reasons that follow, the Medical Defendants'

motion is **GRANTED** in part and **DENIED** in part, and the DOC Defendants' motion is

**GRANTED**.

> I.     **Background**

The following facts are taken from the Amended Complaint ("Compl.") and the Parties'

respective statements of material fact.[2]  D.E. 25, 130, 131, 133.  Plaintiff has been incarcerated

since 1994.  Plaintiff's Medical Response at 1.  Plaintiff went to the prison dental clinic on

September 15, 2009 so that Dr. Charles Geztoff, an oral surgeon, could extract tooth #31, a

molar.  *Id.* at 2.  During the procedure, Dr. Geztoff sneezed, mistakenly cutting the underside of

Plaintiff's tongue.  Medical SOMF at 10.

The parties dispute whether Dr. Getzoff, Ms. Aker, or Plaintiff was aware of the cut—

Plaintiff admits that he did not know "the extent of the damage," but that Dr. Getzoff

acknowledged the cut when he said, "Oops."  Plaintiff's Medical Response at 6.  The Medical

Defendants deny that either Dr. Getzoff or Ms. Aker, his assistant, realized Plaintiff had been

cut.  Medical SOMF at 11.  Plaintiff also alleges that neither Dr. Getzoff nor Ms. Aker checked

under Plaintiff's tongue, though the Medical Defendants allege that Dr. Getzoff did examine

Plaintiff before discharging him.  Plaintiff's Medical Response at 6, Medical SOMF at 12.  After

the procedure was finished, Dr. Getzoff gave Plaintiff gauze, prescribed aspirin, and put a stich

in the extraction site.  Medical SOMF at 12.  Plaintiff claims he was still bleeding heavily and

---

[2] The Medical Defendants' Statement of Material Fact will be referred to hereinafter as "Medical SOMF," and the DOC Defendants' Statement of Material Fact will be referred to hereinafter as "DOC SOMF."  The Plaintiff's Responses to the Defendants' Statements of Material Fact will be referred to hereinafter as "Plaintiff's Medical Response" and "Plaintiff's DOC Response."

that he requested more gauze from Ms. Aker, who refused to give it to him until Dr. Getzoff directed her to. Plaintiff's Medical Response at 14. Plaintiff claims that SCO McCray was present in the clinic during the procedure, and saw Plaintiff was bleeding as he left, but did nothing. Plaintiff's Medical Response at 2, 7.

On his walk back to the housing unit, Plaintiff passed a number of corrections officers—none of whom are the named defendants—and that at no point did any of them stop him, despite blood dripping from his mouth. DOC SOMF at 5. Once back in his cell, Plaintiff's cell-mate alerted an officer that Plaintiff was bleeding, and Plaintiff was given a pass to return to the clinic. Plaintiff's Medical Response at 6.

When Plaintiff arrived back at the clinic, SCO McCray told Plaintiff the dental staff was gone for the day, so he should come back the next day. DOC SOMF at 15-16. Plaintiff was then escorted back to his cell by Sergeant. Bundy. *Id.* at 17. During the walk, Plaintiff alleges that Sgt. Bundy told Plaintiff not to get blood on him, or Bundy would "kick his ass." Plaintiff's DOC Response at 7.

After returning to his housing unit, Plaintiff was once again sent back to the clinic at the recommendation of Sgt. Bundy, SCO Albano and SCO Spiewak. DOC SOMF at 19. Once there, Dr. Ashan examined Plaintiff, and ordered a nurse to call 9-1-1. Plaintiff's DOC Response at 8. Plaintiff alleges he was taken to a hospital in leg shackles and handcuffs while being further restrained by a "black box."[3] Plaintiff's DOC Response at 8-9. Plaintiff alleges that at no point did the clinic staff or the guards take into account that his medical condition might cause excessive bleeding or that the restraints were painful. *Id.*

---

[3] The Court assumes that by "black box," Plaintiff is referring to a handcuff cover, which is placed over the chain portion of the cuffs to prevent tampering with the lock.

Plaintiff claims the doctors at the hospital found the cut under his tongue. Plaintiff's Medical Response at 9-10. He also alleges that at that point, he had lost 1.5 liters of blood. *Id.* at 9. Plaintiff claims that the doctors at the hospital gave instructions to the DOC staff about Plaintiff's care once he was back in prison, but that they were not followed, leading to a second incident on September 25, 2009. DOC SOMF at 26-27. However, Plaintiff admits that he was examined by Dr. Getzoff on September 16, 2009, and "other dental and medical providers" thereafter. Plaintiff's Medical Response at 10.

On September 25, 2009, Plaintiff's "digestive system broke down," and he was rushed to the prison clinic. Compl. at ¶73. After insisting that he be transferred to the hospital, Plaintiff fainted. *Id.* at ¶80. As a result, Plaintiff hit his head on the sink or toilet in the infirmary, resulting in a "gash" on his forehead. *Id.* at ¶¶80-81. Prison staff brought Plaintiff to the hospital, again in restraints. *Id.* at ¶82. Plaintiff spent four days at the hospital, and received seventeen blood transfusions. *Id.* at ¶87.

Plaintiff returned to prison on September 30, 2009. *Id.* at ¶92. The next day, October 1, 2009, Plaintiff was placed in the Management Control Unit ("MCU") by Defendant Ricci. DOC SOMF at 33. The DOC Defendants claim that Plaintiff was placed in the MCU because his supporters sent a $250 fruit basket to the doctors who treated him at the hospital; Plaintiff claims it was to deter him from filing a lawsuit over his treatment. DOC SOMF at 34-36, Plaintiff's DOC Response at 13. Plaintiff remained in the MCU for sixty days in "virtual isolation." Plaintiff's DOC Response at 15, Compl. at ¶94.

Plaintiff has proffered the expert testimony of Dr. Martin Giniger, DMD, PhD, on the issue of medical malpractice related to the tooth extraction. Exs. D and E to the Certification of Anna Kitsos (hereinafter "Kitsos Cert."), D.E. 130-1. Dr. Giniger has been a practicing and

4

licensed dentist in New Jersey since 1984. Ex E to Kitsos Cert. at 1. He also holds a Specialty

Certificate as well as a Master of Science in Dentistry in Oral Medicine, and a PhD in

Biomedical Science with a concentration in Oral Biology. *Id.* He taught at various schools of

dentistry including Louisiana State University Medical Center and UNDNJ. *Id.* at 2. He has

also received awards for his work and "done extensive basic research." *Id.*

Dr. Giniger submitted an expert report and was deposed. Exs. D and E to Kitsos Cert.

He also performed a brief examination of Plaintiff. Ex. E. to Kitsos Cert. at §V. Dr. Giniger's

report and deposition testimony relate only to the standard of care, the deviation therefrom, and

damages as to Dr. Getzoff. Dr. Giniger specifically did not testify as to the standard of care as it

relates to either Dr. Ashan or Ms. Aker. Ex. D to Kitsos Cert. at 96:14-24.

## II.     Procedural History

Plaintiff filed his original Complaint on January 14, 2010. D.E. 1. After his application

to file *in forma pauperis* was denied, Plaintiff re-filed his Complaint on August 6, 2010. D.E. 3,

5. The Complaint was dismissed on October 15, 2010. D.E. 9. Plaintiff filed a motion to

reopen his case which in turn was denied on January 19, 2011. D.E. 11, 12. Plaintiff appealed

the denial to the Third Circuit Court of Appeals, which vacated the denial and remanded the case

for further proceedings. D.E. 14.

On March 5, 2013, Plaintiff filed the Amended Complaint. D.E. 25. The Amended

Complaint alleges the following counts (unless otherwise noted, the count is asserted as to all

Defendants): Count One – violation of Eighth Amendment pursuant to 42 U.S.C. § 1983; Count

Two – breach of contract (against UMDNJ and UCHC); Count Three – medical malpractice

(against the Medical Defendants); Count Four – negligence (against the Medical Defendants, the

New Jersey DOC, Cevasco, and Farrell); Count Five - breach of N.J.S.A. 30:4-91; Count Six –

breach of N.J.S.A. 10A:16; Count Seven –negligent and/or reckless development of policies, procedures or investigations; Count Eight – negligent development, implementation and supervision of policies, procedures, and investigations; Count Nine – municipal violations of 42 U.S.C. §1983; Count Ten – violation of 42 U.S.C. §1986; Count Eleven – intentional infliction of emotional distress; Count Twelve – violation of the New Jersey Constitution; Count Thirteen – federal constitutional tort; Count Fourteen – state constitutional tort; Count Fifteen – fraud; and Count Sixteen – violation of 42 U.S.C. §1985.  After several applications, Plaintiff was appointed pro bono counsel on October 11, 2013.  D.E. 51.

On December 2, 2014, the Medical Defendants filed a motion to dismiss the claims of medical and dental malpractice.  D.E. 84.  The motion was converted by Judge McNulty into a motion for summary judgment under F.R.C.P. 12(d), and denied on February 8, 2016.  D.E. 108, 109.

The instant motions for summary judgment were filed by the Medical Defendants and the DOC Defendants on February 23, 2017.  D.E. 130, 131.[4]  Plaintiff filed his opposition to both motions on Mach 21, 2017.  D.E. 133.[5]  Defendants filed their reply briefs on April 6, 2017. D.E. 138, 139.

### III.    Standard of Review

Summary judgment is proper where the moving party "shows that there is no genuine dispute as to any material fact," and the moving party is entitled to judgment as a matter of law.

---

[4] The DOC Defendants' brief and Medical Defendants' brief will be referred to hereinafter as "DOC Brief," and "Medical Brief," and their replies will be referred to as "DOC Reply" and "Medical Reply."

[5] Plaintiff's Opposition Briefs will be referred to hereinafter as "DOC Opposition" or "DOC Opp." and "Medical Opposition" or "Medical Opp."

Fed. R. Civ. P. 56(a); *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir. 1999).  A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment.  *Id.*  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)).  A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).  To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250.  "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

**IV.   Discussion**

At the outset, Plaintiff did not oppose the Defendants' motion for summary judgment as to counts II, IV, V, VI, VII-IX, X, XV, and XVI. Those counts are therefore dismissed.

As to the remaining counts, Plaintiff raised claims pursuant to both 42 U.S.C. § 1983 and state tort law. The Court will first analyze the Section 1983 contentions.

**a.   42 U.S.C. § 1983 - Eighth Amendment**

Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

Section 1983 does not provide substantive rights; rather, Section 1983 provides a vehicle for vindicating violations of other federal rights. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). In order to state a valid claim for relief under Section 1983, a plaintiff must first allege a violation of a right secured by the Constitution or laws of the United States and, second, a plaintiff must contend that the violation was caused or committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

The Eighth Amendment protects against the imposition of cruel and unusual punishment. *See* U.S. const. amend. VIII. The Eighth Amendment's prohibition against cruel and unusual

8

punishment can include deficient medical care for inmates. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976); *Rouse v. Plantier*, 182 F.3d 192 (3d Cir. 1999). To state a claim of inadequate medical care in violation of the Eighth Amendment, an inmate must prove: (1) a serious medical need; and (2) a prison official's deliberate indifference to that serious medical need. *Estelle*, 429 U.S. at 106. A serious medical need includes a need for which "denial of treatment would result in the unnecessary and wanton infliction of pain" or a "life-long handicap or permanent loss." *Atkinson v. Taylor*, 316 F.3d 257, 273 (3d Cir. 2003) (internal quotations and citations omitted).

The second, subjective element of the *Estelle* test requires an inmate to show that a prison official acted with deliberate indifference to a serious medical need. *Natale v. Camden County Correctional Facility*, 318 F.3d 575, 582 (3d Cir. 2003). Conduct that merely constitutes malpractice or negligence does not rise to the level of deliberate indifference. Instead, deliberate indifference requires a reckless disregard of a known risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). Courts will not second guess "the adequacy a particular course of treatment" in the exercise of sound professional judgment. *Inmates v. Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)). Thus, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. The standard set by *Estelle* prohibits second-guessing of medical decisions made by prison staff that "later prove inappropriate or negligent." *Hankey v. Wexford Health Sources, Inc.*, 383 F. App'x. 165, 168 (3d Cir. 2010). Even when medical care "arguably falls below the generally accepted standard of care, that medical care is often sufficient to rebut accusations of deliberate indifference." *Id.* at 169. In other words, the provision of medical care itself can usually refute a claim of deliberate indifference.

9

A non-physician defendant is not deliberately indifferent to a prisoner's serious medical needs in violation of the Eighth Amendment if she fails to respond to an inmate's complaint regarding medical treatment when the inmate is already receiving treatment by a prison doctor. *Durmer v. O'Caroll*, 991 F.2d 64, 69 (3d Cir. 1993). Non-medical personnel are entitled "to presume the competence of medical staff in treating a prisoner." *Davis v. Superintendent of Somerset SCI*, No. 14-3746, 2015 WL 75260, at *2 (3d Cir. Jan 7, 2015) (citing *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)).

Eighth Amendment claims against non-medical personnel based on an unmet need for medical care are limited to circumstances where the non-medical personnel had "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Spruill*, 372 F.3d at 236. If non-medical staff were justified in believing the prisoner was "in capable hands" with medical experts, dismissal of the Eighth Amendment claim is proper. *Id.*; *Mines v. Levi*, Civil Action No. 07-1739, 2009 WL 839011, at *6 (E.D. Pa. March 26, 2009) (failing to respond to a grievance sent by a prisoner is not sufficient to demonstrate personal involvement of a prison supervisor) (citation omitted)).

### i.   Medical Defendants

Before discussing the merits of Plaintiff's claims against the individual Medical Defendants, the Court must determine whether UMDNJ and UCHC are subject to suit under §1983. States and "arms of the state" are shielded from such claims because they are entitled to sovereign immunity under the Eleventh Amendment. U.S. const. amend. XI; *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 66 (1989). However, municipalities may still be liable under §1983 if Plaintiff can show the violation of his rights was caused by a municipal policy, practice, or custom. *Monell v. Dep't of Soc. Servs. of N.Y.C.* 436 U.S. 658, 690-91 (1978). As of 2015,

the Third Circuit has not determined whether UMDNJ is an "arm of the state" or whether it is

better considered a "private corporation performing state functions." *Miller v. UMDNJ*, 2014

WL 4742287, at *n.3 (D. N.J. Aug. 10, 2015). Neither party addresses this question, as to either

UMDNJ or UCHC. Regardless, the Court need not reach the issue, as Plaintiff has not posited

any facts to show that either UMDNJ or UCHC are liable for a policy, custom, or practice,

subjecting them to liability under *Monell*. Thus, as to the Medical Defendants, the only claims

that remain are against Dr. Getzoff, Ms. Aker, and Dr. Ashan, in their individual capacities.[6]

      As noted, showing a violation of the Eighth Amendment requires more than mere

negligence; the standard is one of recklessness. Plaintiffs seem to acknowledge this distinction

in their briefs. In fact, Plaintiff on several occasions refers to the Medical Defendants' actions as

"negligent." *See, e.g.*, Medical Opp. at 1 ("Specifically, Plaintiff alleges that Dr. Getzoff was

negligent in the performance of the [tooth] extraction"). In short, Plaintiff has apparently stated

a claim of medical negligence against Dr. Getzoff, but the alleged facts fall short of setting forth

a potentially valid Section 1983 claim even when viewed in a light most favorable to Plaintiff.

*Compare Pearson v. Prison Health Services*, 850 F.3d 526, 540 (3d Cir. 2017) (reinstating

§1983 claim against prison nurse who refused to examine plaintiff, forced him to crawl across

his cell to his wheelchair before she would treat him, and placed him in the infirmary despite

recognizing that plaintiff could be suffering from appendicitis) *and Spruill*, 372 F.3d at 237

(reinstating §1983 claim against a doctor who was alleged to have acted "maliciously and

sadistically" with an intention "to inflict pain . . . without any medical justification") *with*

---

[6] Plaintiff does not address how the Medical Defendants could be liable in their official
capacities, given they are potentially state officials. *See Jones v. Hashagen*, 512 Fed.App'x. 179,
182 (3d Cir. 2013) (finding that a doctor charged with an Eighth Amendment violation while he
"contracted with the state to provide medical services to inmates was a 'state actor'").

*Stewart v. Pennsylvania Dep't of Corrs.*, 677 F.App'x 816, 820 (3d Cir. 2017) (affirming district court's dismissal of §1983 claim for initial misdiagnosis and delay in treatment for five days while plaintiff was in "significant pain" because of a broken ankle that the prison medical team believed to be a mere sprain).

At the outset, Plaintiff has not cited to any facts suggesting a deliberate indifference to his medical needs when he was hospitalized the second time over gastrointestinal issues.  He has also not provided reliable evidence that the second hospitalization was related to the tooth extraction.  Instead, the record reflects that when Plaintiff complained of stomach pain, he was taken to the hospital and treated.

As to the tooth extraction, and as in *Stewart*, Plaintiff saw multiple medical professionals in the month of September 2009—he was seen at the on-site prison clinic on site at the prison and was sent to the hospital.  As to Dr. Ashan, when he examined Plaintiff following the tooth extraction, the doctor caused an ambulance to take Plaintiff to the hospital for immediate treatment.   Ms. Aker, a non-physician who was under the direct supervision of Dr. Getzoff, is similarly not liable under Section 1983.  Finally, while Dr. Getzoff is apparently responsible for the accidental laceration to Plaintiff's tongue, the doctor did continue to see and treat Plaintiff when he returned from the hospital the first time.  As such, Plaintiff does not raise a genuine issue of material fact precluding summary judgment as to the individual Medical Defendants vis-à-vis Section 1983.

ii.    **DOC Defendants**

At the outset, as to the New Jersey DOC, plaintiff has not presented evidence of an improper policy, custom, or practice, so the claims against the New Jersey DOC are dismissed.  As to the supervisory DOC Defendants, §1983 claims cannot be brought under a theory of

*respondeat superior. Polk County v. Dodson*, 454 U.S. 312, 325 (1981). Rather, Plaintiff bears the burden of showing "personal involvement in the alleged wrongs . . . [which] can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Here, Plaintiff's Eighth Amendment against New Jersey DOC Commissioner George Hayman, Assistant Director of Health Services for the New Jersey DOC Dr. Richard Cevasco, Supervisor of the Health Services Unit at the New Jersey DOC Thomas Farrell, and prison Administrator Michelle Ricci[7] are dismissed. None of these four Defendants were personally involved in Plaintiff's medical care, nor is there any evidence demonstrating that they had actual knowledge of, and acquiesced to, any such violation of his rights. *Baker v. Monroe Township*, 50 F. 3d 1186, 1190-91 (3d Cir. 1995).

The remaining DOC Defendants are Sgt. Bundy, SCO McCray, SCO Spiewak, and SCO Albano.[8] Generally, "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that a prisoner is in capable hands." *Spruill*, 372 F.3d at 236. None of the four were the corrections officers that Plaintiff claims saw him walking from the clinic, dripping blood. Compl. at ¶44. On the contrary, when Defendants Spiewak, Albano, and Bundy saw the blood, they rushed to Plaintiff's cell. Compl. at ¶45. SCOs Spiewak and Wilson gave Plaintiff an emergency pass to return to the prison clinic on the day of the extraction. *Id.* at ¶48. Additionally, all four asked about Plaintiff's health between September 6, 2009 and September 25, 2009. Ex. A to Kitsos Cert. at 149:21-24.

---

[7] The §1983 retaliation claim against Ms. Ricci is discussed *infra* at §c.

[8] The individual DOC Defendants are not entitled to qualified immunity; the Eighth Amendment's prohibition against deliberate indifference to a serious medical need is a clear and well-established constitutional right. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The two main claims Plaintiff makes are against Defendants Bundy and McCray.  Bundy, Plaintiff alleges, ordered Plaintiff not to spit blood on him while Bundy escorted Plaintiff to and from the clinic, "otherwise it will be your ass."  *Id.* at 131:3-4.  This comment was allegedly made directly after three officers, Bundy, Albano, and Spiewak, had agreed to take Plaintiff back to the clinic for the third time that day.  *Id.* at 130-131.  While arguably an insensitive comment, it is not relevant to the issue of whether Bundy deprived Plaintiff of necessary medical care.  To the contrary, the alleged statement was made while Bundy was escorting Plaintiff to the clinic. Thus the statement does not raise a genuine issue of material fact that would preclude summary judgment.

SCO McCray is alleged to have turned Plaintiff away from the dental clinic when Plaintiff returned for the second time on September 15, 2009.  *Id.* at 125-126.  While in close proximity, the dental clinic is distinct from the medical clinic.  *See Id.* at 57-62.  Plaintiff's own deposition states that the dental staff had left by the time he was brought back to the clinic on Sept. 15, 2009.  *Id.* at 59-60.   Plaintiff stated McCray said: "You can come back tomorrow. The dentist will be in tomorrow."  *Id.* at 60:1-2.  Given this account, and viewing the evidence in a light most favorable to Plaintiff, SCO McCray did not turn Plaintiff away because he was deliberately indifferent to Plaintiff's predicament; rather, he told Plaintiff to come back when someone with appropriate medical training would be available to help him.  Plaintiff has not presented credible evidence that dental staff were in fact available but McCray nonetheless turned him away.  Moreover, shortly thereafter, Plaintiff was brought to the medical clinic, examined by Dr. Ashan, and transported to the hospital for treatment.

### b.  Medical Malpractice

To properly state a claim for medical malpractice, Plaintiff must show: (1) a deviation

from the standard of care; (2) an injury proximately caused by that deviation; and (3) damages

suffered as a result. *Komlodi v. Picciano*, 217 N.J. 387, 409 (2014).  The elements are the same

for a claim of dental malpractice.  *Id.*  Generally, to "prove the first two elements, a plaintiff

must present testimony of an expert witness." *Lewis v. Brown*, 2010 WL 1371939, at *12 (D.

N.J. 2010).  The expert must testify as to "the applicable standard of care . . . [and] whether the

defendant's conduct was unreasonable under the circumstances." *Id.*  However, expert testimony

may not be necessary if the negligence is so plain that a jury would not need more than lay

understanding to determine that there was a deviation from the standard of care. *Id.* at 13.  This

basis, known as the common knowledge doctrine, is applicable for example when a surgeon

operates on the wrong body part. *Id.*  Expert testimony is likewise not required if plaintiff can

show that the doctrine of *res ipsa loquitur* applies, that is, where negligence can be inferred if:

"the occurrence itself ordinarily bespeaks negligence, the instrumentality was within the

defendant's exclusive control, and there is no indication in the circumstances that the injury was

the result of the plaintiff's own voluntary act or neglect." *Jerista v. Murray*, 185 N.J. 175, 192

(2005). *Res ipsa loquitor* may apply, for instance, when a surgeon nicks an artery during

surgery.

Pursuant to New Jersey's Torts Claims Act ("TCA"), N.J.S.A. 59:1-1 *et seq.*, Plaintiff

can recover for pain and suffering against a public entity but there must be a "permanent loss of a

bodily function[.]"[9] N.J.S.A. 59:9-2(d).  Plaintiff must show (1) and objective permanent injury;

---

[9] Economic and consequential damages are not limited by the TCA, but Plaintiff has not
provided evidence of such damages.  The Medical Defendants note that Plaintiff cannot claim his

and (2) a permanent loss of bodily function that is substantial." *Gihooley v. County of Union*, 164 N.J. 533, 541 (2000). Additionally, Plaintiff bears the burden of showing, with "objective medical evidence," that the injury suffered is permanent. *Brown v. City of New Jersey*, 2015 WL 586022, at *12 (D.N.J. Feb. 10, 2015) *aff'd in part, vac'd in part*, 644 Fed. App'x 139 (3d Cir. 2016).

Plaintiff makes two claims regarding the medical care he received which, while close in time, are distinct. First, Plaintiff claims Dr. Getzoff cut the underside of his tongue during the extraction resulting in "numbness, oral pain, difficulty eating, difficulty speaking, and loss of taste and temperature sensation." Plaintiff's Medical Response at 2. Plaintiff also claims that he suffered from a "gastrointestinal bleed" that was either caused or exacerbated by the cut under his tongue. *Id.* Plaintiff has presented no evidence showing that his gastrointestinal injuries were caused, or exacerbated by, medical negligence. Thus, the medical malpractice claim as it relates to Plaintiff's gastrointestinal difficulties is dismissed. As a result, the Court will only address the claim of the tongue injury and the alleged effects.

### i.   Dr. Ashan & Ms. Aker

Turning to Plaintiff's tooth extraction and the resulting complications, Plaintiff proffered no expert testimony as to the standard of care for either Dr. Ashan or Ms. Aker. Plaintiff instead argues that the doctrines of common knowledge or *res ipsa loquiur* apply, and no expert testimony is required. Medical Opp. at 10-12.

The common knowledge doctrine and *res ipsa loquitor* do not apply to the alleged actions of either Dr. Ashan or Ms. Aker. Instead, expert testimony was necessary to establish the

---

medical expenses as part of his damages because such expenses are paid for by the State. Medical Brief at 15. Plaintiff does not dispute this point.

standard of care and a deviation therefrom.  Plaintiff admits that Dr. Ashan "ordered a nurse to call 911 for an ambulance" when he saw Plaintiff for the first time on September 15, 2009. Compl. at ¶53-54.  All that Plaintiff alleges with respect to Ms. Aker is that she initially did not want to give Plaintiff more gauze when he asked for it.[10]  *Id.* at ¶37.  Thus, because Plaintiff has failed to present expert testimony on the question of the standard of care, a subsequent deviation from the standard, and causation, Plaintiff's claim of medical malpractice as to Dr. Ashan and Ms. Aker fails.

### ii.     Dr. Getzoff

Plaintiff's expert, Dr. Giniger, testified that Dr. Getzoff "made errors before, during and after Plaintiff's treatment . . . demonstrating . . . that his treatment fell beneath the professional standards of care in any community."  Ex. E to Kitsos Cert. at §VII.  Dr. Giniger opined: "It is reasonable to conclude . . . that the laceration was caused by Dr. Getzoff during the course of a difficult extraction."  *Id.*  In his opinion, "Plaintiff has suffered permanent damage . . . [including] numbness, oral pain, and his ability to eat/taste is compromised."  *Id.*

The Medical Defendants "do not dispute that Plaintiff has met the first element of his dental negligence claim against Dr. Getzoff," and instead they address whether Plaintiff and Dr. Giniger have adequately plead causation and the required statutory elements of Plaintiff's injury, *i.e.* whether Plaintiff has in fact suffered an objective permanent injury and a permanent loss of bodily function that is substantial.  *Gilhooley*, 164 N.J. at 541.  The Medical Defendants'

---

[10] Ms. Aker's appropriate standard of care would also apparently have to take into account the fact that she was under the supervision of the treating physician, Dr. Getzoff.  As noted, Plaintiff has presented no expert testimony as to Ms. Aker's standard of care or deviation therefrom.  Dr. Giniger specifically stated that he did not offer his opinion as to the applicable standard of care for other members of the medical staff.  Ex. D to Kitsos Cert. at 96:14-24.

objection as to damages is twofold: they argue that the loss of bodily function Plaintiff alleges is not permanent and that it has not been proven by objective medical tests. Medical Reply at 4-5.

The Medical Defendants first challenge whether Dr. Giniger was sufficiently certain as to the causation of Plaintiff's injury. Medical Brief at 16-18. Dr. Giniger stated in his report that Dr. Getzoff "caused the problem and then failed to diagnose the problem," and that "[i]t is reasonable to conclude from the data presented below that the laceration was caused by Dr. Getzoff during the course of a difficult extraction." Ex. E to Kitsos Cert. at §§II, VII. He then adds: "Plaintiff continues to suffer from the consequences of trauma caused by the deep laceration that occurred." *Id.* at §VII. Dr. Getzoff also provided sufficient reasoning to support his opinions. The Court is therefore satisfied that Dr. Giniger is "reasonably confident of the relationship between the plaintiff's injuries and his . . . diagnosis and treatment." *Galvin v. Mizuho Medical Corp.*, 2008 WL 4791023, at *7 (N.J. App. Div. Nov. 5, 2008). Dr. Getzoff is not entitled to summary judgment on the issue of causation.

The permanency of Plaintiff's injury present a more difficult question. As noted, Plaintiff must show both an objective permanent injury and a permanent loss of bodily function that is substantial. *Gihooley*, 164 N.J. at 541. The New Jersey Supreme Court has stated that "*permanent loss of* eyesight, *taste*, and smell satisfy the statutory standard." *Brooks v. Odom*, 150 N.J. 395, 403 (1997) (emphases added). In *Gilhooley*, the Supreme Court of New Jersey reiterated its prior ruling: "In *Brooks,* we identified a number of injuries that, if supported by medical proof, obviously meet both prongs of the standard: injuries causing blindness, disabling tremors, paralysis and *loss of taste* and smell. [*Brooks*, 150 N.J.] at 403. Indeed such injuries, by their very nature, are objectively permanent and implicate the substantial loss of a bodily function (e.g., sight, smell, *taste*, and muscle control)." 164 N.J. at 540 (emphases added). Yet

18

the *Gilhooley* Court further noted that not "every objective permanent injury results in substantial loss of a bodily function[,]" such as a "completely healed fracture without any objective evidence of permanent substantial impairment." *Id.* (citation omitted).

Under the first prong, there must be an "objective injury," *Thorpe v. Cohen,* 258 *N.J. Super.* 523, 530 (App.Div.1992), established by "objective medical evidence in the record," *Hammer v. Twp. of Livingston,* 318 *N.J. Super.* 298, 305 (App.Div. 1999). Furthermore, "a plaintiff must prove by objective medical evidence that the injury is permanent." *Brooks,* 150 *N.J.* at 402–03. A plaintiff cannot recover for "[t]emporary injuries, no matter how painful and debilitating," nor "for mere 'subjective feelings of discomfort.'" *Id.* at 403 (quoting *Ayers v. Twp. of Jackson,* 106 *N.J.* 557, 571 (1987)). Accordingly, a plaintiff may not recover if the impact of his injury is limited to "lingering pain, resulting in a lessened ability to perform certain tasks because of the pain." *Knowles v. Mantua Twp. Soccer Ass'n,* 176 N.J. 324, 332 (2003).

The second prong imposes a substantiality requirement, meaning that the injury must be substantial. The loss must be more than a mere limitation but does not have to constitute a total loss of a body function. *Brooks,* 150 *N.J.* at 406. There is no bright-line rule which "preclude[s] finding a permanent and substantial loss of a bodily function merely because a claimant still is able to function reasonably well at work and at home, irrespective of the nature or degree of the impairment." *Ponte v. Overeem,* 171 *N.J.* 46, 53 (2002). Each case is fact-sensitive, focusing on the "'nature or degree of the ongoing impairment.'" *Knowles,* 176 *N.J.* at 331 (quoting *Ponte,* 171 N.J. at 53); *Kahrar v. Borough of Wallington,* 171 N.J. 3, 15 (2002) (identifying "the degree of injury and impairment" as the appropriate query). Nevertheless, in every case, a plaintiff must be able to identify some physical manifestation of permanency. *See Ponte,* 171 N.J. at 54.

19

The permanent injuries Plaintiff complains of are numbness, difficulty eating and speaking, and loss of taste. Medical Opposition at 13. Dr. Giniger performed a limited examination of Plaintiff which included a "2-point discrimination test" which "confirmed a mild paresthesia." Ex E. to Kistos Cert. at §V. Dr. Giniger also performed a visual inspection with a mirror, explorer, periodontal probe, and disposable paper supplies. *Id.* To the extent the exam was limited, it appears to be through no fault of Dr. Giniger. Instead, Dr. Giniger was limited by the DOC as to which tools and instruments the doctor could bring into the facility to conduct the examination. Dr. Giniger testified that the laceration under Plaintiff's tongue could cause nerve damage, and that oral pain is a "strong possibility" when there is a trauma. Ex. E. to Kitsos Cert. at 67-68. Dr. Giniger was unable to state, within a degree of medical certainty, that the following were caused by Dr. Getzoff's negligence: mild trismus, temporomandibular joint disorder, or decreased lower lip sensation.

In this case, the Medical Defendants do not perform much of an analysis concerning the permanency issue. Instead, the Medical Defendants summarily state that "[a]s nothing more than Plaintiff's subjective feelings of discomfort and minor ailments have been claimed as injury on behalf of Plaintiff, [the Medical Defendants] are entitled to immunity for any damages." Medical Brief at 17-18. Plaintiff correctly notes that a permanent loss of taste can meet the statutory requirement as per the New Jersey Supreme Court. In addition, Dr. Giniger performed an examination of Plaintiff (including visual inspection, manual probe, and a two-point discrimination test) despite the limitations imposed by the DOC. Because the Medical Defendants, as the moving party, bear the burden of demonstrating that summary judgment is appropriate and because their analysis is essentially conclusory, the Court declines to grant summary judgment. The Medical Defendants have not met their burden.

Because Dr. Giniger testified to the standard of care, Dr. Getzoff's alleged deviation therefrom, causation, and permanent damage, and the Medical Defendants have failed to sufficiently rebut this evidence (or offer a proper analysis in the first instance), Plaintiff has raised a genuine issue of material fact as to the medical malpractice claim against Dr. Getzoff.

### c.   §1983 Retaliation Claim

"Section 1983 imposes liability for retaliatory conduct by prison officials if the conduct was motivated 'in substantial part by a desire to punish [an inmate] for the exercise of a constitutional right.'" *Alexander v. Fritch*, 396 Fed. App'x 867, 871 (3d Cir. 2010) (citations omitted). The elements of a retaliation claim are "(1) that the conduct leading to the alleged retaliation was constitutionally protected; (2) that he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) that his protected conduct was a substantial or motivating factor in the decision to discipline him." *Id.* But, defendants may still prevail if they can prove "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Id.* As noted, the plaintiff in a retaliation case "must prove that the conduct which lead to the alleged retaliation was constitutionally protected." *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).

The Third Circuit has also added specific requirements for the causation element when an inmate claims a violation of his First Amendment rights. Plaintiff must show: either "(1) an unusually suggestive time proximity between the protected activity and the alleged retaliatory action; or (2) a pattern of antagonism coupled with timing to establish a causal link." *De Franco v. Wolfe*, 387 F.App'x 147, 154 (3d Cir. 2010) (affirming the district court's dismissal of inmate's claim that he his cell assignment was changed because he threatened to sue prison officials).

Plaintiff claims that SCO Newsom (who is not a named Defendant) told him that Plaintiff was being placed in MCU because of the fruit basket sent by his supporters but also said it was to deter Plaintiff from filing a lawsuit. Ex. A to Kitsos Cert. at 1601:18-25, 175: 11-14, 178: 6-9.[11] Plaintiff suggests that his detention in the MCU violated his First Amendment right "to speak out about his medical treatment," in one line of his Opposition without subsequent analysis. DOC Reply at 12-13. However, it is not alleged that Plaintiff actually did threaten to sue, and it is not clear from Plaintiff's deposition or any other record that he was openly complaining about his medical treatment, either. If Plaintiff is arguing that the protected activity is his access to the courts—which is not made clear in the brief—clearly, he was not deterred. Plaintiff obviously filed the case and has extensively litigated the action. *See* Docket No. 10-258. Plaintiff does not present evidence creating a genuine issue of material fact that he was retaliated against for threatening to sue. As was the case in *DeFranco*, "[t]here is nothing in the record that permits a reasonable inference the decision would have been any different absent the threat to sue." *DeFranco*, 387 F.App'x at 155. Critically, and as noted, Plaintiff's evidence is not clear as to whether he voiced objections to his medical treatment, or that he even threatened to sue, before he was placed in MCU.

Plaintiff's Reply also sets out the standard for placing an inmate in the MCU pursuant to New Jersey DOC regulations. DOC Reply at 10-11 & n.4. However, a mere violation of regulations (if true) does not necessarily equate to a constitutional violation. In addition, Defendants offer an alternate explanation; Defendant Ricci in her deposition stated that inmates

---

[11] SCO Newsom allegedly said: "You're there because [Ricci] doesn't want a lawsuit. She's trying to punish you. She wants to make an example of you. And she wants to quash all litigation." Ex. A to Kitsos Cert. 178:6-9.   Plaintiff also claimed he was put in MCU as part of a cover up. *Id.* at 180:1-12.

can be kept in the MCU during an investigation, and that Plaintiff was housed in the MCU while the investigation concerning the fruit basked was conducted. DOC Brief at 26-27. Plaintiff does not refute that the gift was sent or that it can be a basis for an internal DOC investigation. Plaintiff has not pointed to evidence which creates a genuine issue of material fact precluding summary judgment on this claim.

### d.  Intentional Infliction of Emotional Distress

To establish a claim of intentional infliction of emotional distress, Plaintiff must plead three elements: (1) intentional and outrageous conduct on the part of the Defendant; (2) proximate cause—i.e. that the Defendant's actions caused emotional distress; and (3) severe emotional distress. *Buckley v. Trenton Saving Fund Society*, 111 N.J. 355, 366 (1988). The emotional distress must be "so severe that no reasonable man could be expected to endure it." *Id.* Plaintiff has failed to present sufficient evidence of severe emotional distress. To be certain, Plaintiff argues that Defendants' actions caused him "severe distress," but he points to physical, not emotional, distress in support. Thus, Count XI is dismissed.[12]

### e.  Remaining Federal & State Constitutional Claims

Plaintiffs last remaining claims were brought against "all defendants" in their "individual and official capacities" for violating Plaintiff's federal constitutional rights under the Fifth, Eighth, and Fourteenth Amendments, and Plaintiff's rights under the New Jersey state constitution. *See* Compl. at ¶147-161. Count XII appears to be a *Monell* claim that all Defendants' actions "constitute [sic] acts and a custom and/or policy to violate the constitutional rights of Plaintiff." *Id.* at ¶148. As stated above, Plaintiff has alleged no facts to show an

---

[12] Because the Court finds the third element to be dispositive, this Opinion does not reach the other two requirements. However, it also appears that Plaintiff's emotional distress claim would be subject to summary judgment on the first two elements as well.

inappropriate custom or policy enacted by any Defendant.  Count XIII is a claim for a federal constitutional tort under the Fifth, Eighth, and Fourteenth Amendments.  Plaintiff's Eighth Amendment claim has been addressed above and dismissed.  Plaintiff has otherwise fails to articulate a Fifth or Fourteenth Amendment violation.  Count XIV is a claim for a state constitutional tort under Article I ¶ 7 of the New Jersey Constitution, which guarantees the right "of the people to be secure in their persons, houses, papers and effects."  Plaintiff has failed to allege any facts that would give rise to a violation of this Fourth Amendment analog.  Thus, Counts XII, XIII, and XIV are dismissed.

### f.  Supplemental Jurisdiction

Federal district courts have supplemental jurisdiction over state law claims related to claims brought under federal statutes.  28 U.S.C. §1367(a).  The court can, in its discretion, decline to exercise supplemental jurisdiction if it has dismissed the claims over which it had original jurisdiction.  29 U.S.C. §1367(c)(3).  In the exercise of that discretion, the court "should take into account generally accepted principles of 'judicial economy, convenience, and fairness to the litigants.'"  *Growth Horizons, Inc. v. Delaware Cty, Pa.*, 983 F.2d 1277, 1284 (3d Cir. 1993) (internal citations omitted).

Here, the only claim that has survived the instant motions is a state law claim for medical malpractice against Dr. Getzoff.[13]  Rather than remand to state court, this Court will, in its discretion, retain jurisdiction over the remaining state law claim.[14]  This matter has been litigated

---

[13] The Court is aware that it can dismiss the remaining state law claim without prejudice and toll the statute of limitations and permit Plaintiff to re-file in state court.  *See Hedges v. Musco*, 204 F.3d 109, 123-4 (2d Cir. 2000).

[14] *See generally* 28 U.S.C. §1367(a); *Sarpolis v. Tereshko*, 625 Fed.App'x. 594, 600-01 (3d. Cir. 2016) (stating "it is simply not the case that most courts accept that the proper course is to remand whenever all federal claims are dismissed").

thoroughly in this Court.  In addition, the Court is aware that Plaintiff's counsel did him (and the Court) a tremendous service in accepting the matter *pro bono*.  Thus, due to the Court's familiarity with the matter and in fairness to the litigants, it will retain jurisdiction.

## V.      Conclusion

For the reasons stated above, the Medical Defendants' motion for summary judgment is **GRANTED** in part and **DENIED** in part, and the DOC Defendants' motion for summary judgment is **GRANTED** in its entirety.  The Court will continue to exercise its supplemental jurisdiction over the remaining claim against Dr. Getzoff.  An appropriate Order accompanies this Opinion.


Dated: October 11, 2017


John Michael Vazquez, U.S.D.J.